282 So.2d 837 (1973)
BIG "A" SAND & GRAVEL COMPANY, INC., et al.
v.
BAY SAND & GRAVEL COMPANY, INC., et al.
No. 9420.
Court of Appeal of Louisiana, First Circuit.
August 28, 1973.
Rehearing Denied September 26, 1973.
Writ Refused November 16, 1973.
*838 Bobby L. Forrest, Baton Rouge, for appellants.
Ashton L. Stewart, Baton Rouge, for appellees.
W. P. Wray, Jr., Baton Rouge, filed amicus curiae brief for Ross E. Cox & Frank G. Sullivan, Jr.
Before SARTAIN, BLANCHE and WATSON, JJ.
WATSON, Judge ad hoc.
Plaintiffs, Big "A" Sand & Gravel Company, Inc. and Albert Taylor Sanders, Jr., instituted this suit against defendants, Bay Sand & Gravel Company, Inc., Ace Sand & Gravel Company, Inc., Lex Jenkins, individually, and Ruth Jenkins, individually, to recover the sum of $193,919.28, the balance due on what was alleged to be a contract between the parties. The trial court found that ". . . the plaintiffs have not established the existence of a valid contract under Article 1779 of the Civil Code. The requisite element of consent is lacking, and as a consequence thereof, plaintiffs cannot prevail on this claim." (TR. 31) The plaintiffs have appealed from this adverse judgment. We affirm.
The primary question is a factual one; the matter turns on a determination of the intent of the parties.
The facts are complex. This court is impressed with the trial court's careful consideration of the points at issue and the competent briefs received from all counsel.
In narrative form, the matter developed as follows:
Plaintiff, A. T. Sanders, Jr., is the president and owner of 50% of the stock in Big "A" Sand & Gravel Company, Inc. Ross Cox and Frank Sullivan each own 25% of this company. Big "A" was purchased from Baton Rouge Sand & Gravel for an amount stated at different times in the record at $180,000.00 and $190,000.00. A note was given to Fidelity National Bank of Baton Rouge for the amount of the purchase by Big "A" and the three owners individually. The purchase included certain equipment as well as the right to mine sand and gravel under the "Harvell lease". A second note was signed by the same parties in connection with the purchase of a dredge for $20,000.00. A third note in the amount of $40,000.00 was signed by the same parties to pay off certain creditors.
Mr. Sanders, Mr. Cox and Mr. Sullivan were also partners in the same proportions in Tiger Sand & Gravel Company, Inc. which owned seven (once eleven) trucks.
Despite the fact that Dunham Concrete Company, Inc. purchased everything Big "A" could produce, Big "A" did not prosper in the sand and gravel business. The three notes it owed at Fidelity National Bank totaled approximately $240,000.00, and had aggregate monthly payments of $3,528.00.
In October of 1968, Mr. Ted Dunham, Jr., who was a close friend of Mr. Sanders and also a limited endorser of Tiger Sand & Gravel Company's notes for "approximately $112,000.00", approached Mr. and Mrs. Jenkins, defendants, in regard to their taking over Big "A". The proposal was that Mr. Sanders would receive 10¢ a yard royalty and his trucks would be used. Mr. Jenkins testified that he declined this proposal. He did make an offer of $180,000.00 for Big "A" which was refused.
Subsequently, Mr. Payne Fletcher took over the operation of Big "A" for approximately four months on a rental basis whereby he paid Mr. Sanders a 10¢ a yard override. Mr. Sanders stated that this arrangement *839 brought him about $100.00 a month over and above the amount of Big "A"'s notes. However, Mr. Sanders broke this arrangement because
"... he was messing me up on those eleven trucks and wasn't letting them haul right, ... and that's when Mr. Jenkins and I made this agreement...." (Deposition of Mr. Sanders, p. 33).
In this interim, Mr. and Mrs. Jenkins were not shipping to Dunham Concrete. They desired to obtain Dunham Concrete Company's business. A proposal was made that they would receive a contract for 85% of Dunham Concrete's business for eight years, and they then offered to buy Big "A" for $233,000.00, the balance due on Big "A"'s notes to Fidelity National Bank. There was also a contingent agreement to use Tiger's trucks. The Fidelity National Bank approved an application for Bay Sand & Gravel Company, Inc. to assume Big "A"'s notes subject to Mr. Jenkins' personal endorsement.
An application was made to Fidelity National Bank for Ace Sand & Gravel Co., Inc. to take over Big "A"'s debt to the bank. In connection with this application, Mr. Millard G. Redden, Executive Vice President and Cashier of Fidelity National Bank, testified as follows:
"A. The application was made in Ace, the name of Ace Sand & Gravel Co., Inc. At a later date in talking to Mr. Jenkins he stated that he would not personally obligate himself, nor would he mortgage his other assets. He wanted to, this loan to be in the name of Bay, which was agreeable to our bank since it was still Lex Jenkins.
Q. So, you had agreed either to let Lex Jenkins or Bay replace the obligations Mr. Sanders had on the Big "A" note?
A. That is correct.
Q. And Mr. Jenkins had been approved to replace him on this obligation?
A. That is correct."
(Exhibit Vol. III, p. 327)
Further Mr. Redden, referring to a subsequent visit by Mr. Jenkins, stated:
"A.... You mean, was the application approved without Mr. Jenkins' endorsement?
Q. Yes.
A. No, it, no.
Q. But he, but he told you he didn't want the application, he wasn't going to endorse it?
A. That's correct.
Q. So you never did submit to the banking authorities, your loan committee, a proposition for Bay to buy without Jenkins endorsing it?
A. No, I didn't."
(Exhibit Vol. III, p. 330).
We feel that the following testimony accurately reflects the understanding of the parties as to their proposed contract:
Mr. Sanders testified:
"I told him that I'd get him a contract with Dunham for eighty-five percent of his material if they would take over the notes at the bank, and they agreed."
(Exhibit, Vol. II, p. 161)
Mr. Dunham testified:
"Well we, we'd agreed to give them eighty-five, Dunham Concrete Co. had agreed to give them eighty-five percent of its sand and gravel business, and they agreed to take it, at a prescribed price at various plants. And they also agreed to use Tiger trucks at certain locations. I think it was either seven or eleven trucks."
(Exhibit, Vol. IV, p. 504)
*840 Mr. Jenkins testified:
". . .it was ... agreed if the sale and it all went through, that I would have to have a signed contract with Dunham Concrete Products for the eighty-five percent."
(Exhibit Vol. III, p. 277)
Mrs. Jenkins testified:
"And, of course, we had not shipped anything to Dunham during this period of time, and he very well knew that we wouldn't go into any kind of negotiations with him at that point without a written contract, because we had had his word before. So he said, Ruth, go to your lawyer and have anything drawn up in black and white for a contract for eighty-five percent of the business, and I'll sign it.
(Exhibit Vol. V, p. 674).
The subsequent events, as well as the applicable legal principles, have been ably expressed by the trial court. We adopt and approve the trial court's resume of the additional facts and reasons for judgment, as follows:
"Before the sale and the materials' requirements' contract could be signed, however, the Jenkins were informed by Ted Dunham, Jr., that Dunham Concrete Company, Inc. was involved in a proposed merger, and that additional time would be needed before he could sign the agreement. After Dunham was unable to sign, but upon his assurance that he would buy eighty-five (85%) percent of his requirements until the agreement could be signed, Jenkins operated the lease and used the equipment of plaintiffs in return for the payment to plaintiffs of the monthly installment of Three thousand five hundred twenty-eight and no/100 ($3,528.00) Dollars due by plaintiffs to the Fidelity National Bank, with the understanding that the purchase price would be reduced by the amount of these interim payments.
"In July of 1970, Mr. Dunham was ready to sign the materials' contract, and so advised the parties to this suit. At this same time plaintiff Sanders was desirous of establishing a new line of credit to finance another business venture, and pursuant to this end had Lex Jenkins sign an instrument wherein the latter acknowledged he had purchased the assets of the plaintiff corporation, and was to be allowed until August 31, 1970 to consummate the assumption of the plaintiffs' loan.
"Prior to the time required for effectuating the said financing, however, the Jenkins were informed that Dunham Concrete Company, Inc. had entered into negotiations with Clegg Concrete, Inc. relative to the possible sale of its business to the latter corporation. Subsequent to the receipt of this information, the Jenkins did not pursue Dunham's previously expressed willingness to sign the materials' contract, and did not undertake the assumption of the balance due on the plaintiffs' promissory notes. Instead, the rather loose arrangement between the parties to the suit was simply continued, and the Jenkins began negotiating a materials' requirements' contract with Clegg.
"The sale of Dunham Concrete Company, Inc. was subsequently consummated, and a materials' requirements' contract for fifty (50%) percent of Clegg Concrete's needs was signed with the Jenkins. The Jenkins then began supplying Clegg Concrete, and continued to cause payment to plaintiffs of the amount of the monthly note until terminating the arrangement with plaintiffs on March 4, 1971. The instant suit followed for the balance due on plaintiffs' promissory notes.
"In the main, plaintiffs contend that a contract of sale was perfected in July of 1969 when the parties reached an agreement as to the object and the price in accordance with Article 2456 of Revised Civil Code. Plaintiffs further contend that even if the materials' requirements' contract *841 with Dunham Concrete was a condition of the sale, the same was fulfilled. Finally, plaintiffs submit that as the defendants accepted the benefits of utilizing the equipment and the lease, they cannot now repudiate their obligation.
"Defendants counter these contentions with the arguments that the parties never reached a definite agreement, and that the parties' negotiations did not culminate in a contract because contrary to their common understanding, the same was never reduced to writing and signed.
"With regard to these arguments, the Court makes the following observations:
"A contract of sale is a bilateral agreement by which each of the parties obligates himself to the other. The contract is considered to be perfect between the parties, and the property of right acquired to the purchaser, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered nor the price paid. Rev. Civ.Code Art. 2456. The consent of the parties, of course, is a cardinal requisite to the formation of such a contract, and as defined in Civil Code, involves the concurrence of intention in two or more persons, with regard to a matter understood by all, reciprocally communicated, and resulting from a free and deliberate exercise of the will of each party. Rev.Civ.Code Art. 1819.
"Applying the foregoing to the cause at bar, the Court is constrained to conclude that a contract of sale was never effected by the parties for the reasons set out below:
"The record of the instant cause reflects that all during the negotiations between the parties, it was intended that any agreements reached by them would be incorporated in written contracts to be signed by all parties. This is shown not only by the testimony of defendant, Mrs. Ruth Jenkins, but also by the testimony of the plaintiff, A. T. Sanders. The pertinent testimony of these parties on this point is as follows:
Mrs. Jenkins testified:
"Q. Was it a part of your original arrangements and discussions with both Big "A" Sand & Gravel Co. and Dunham Concrete Co. that whatever contracts were entered into would have to be in writing?
A. Always.
Q. That was one of the conditions?
A. Yes, sir.' and Mr. Sanders testified:
"Q. And both contracts were then to be prepared and signedthat is the one between Big "A" selling to Bay and Dunham obligating himself to Bay to buy eighty-five percent?
A. Right.
Q. At all, at all times the contracts were to be signed, and that's what you negotiated for?
A. Yes, sir, they were supposed to be signed.
Q...., at all times, the contracts were to be signed, and that's what you negotiated for?
A. Yes, sir, they were supposed to be signed.'
"With regard to this testimony, the Court must take cognizance of the fact that the materials' requirements' contract was never signed by Ted Dunham, Jr. and that the evidence preponderates to the effect that the defendants never caused their signatures to be affixed to the instrument evidencing the proposed contract of sale. Significantly, the two contracts were to be executed simultaneously, and on being apprised of the fact that Mr. Dunham could not sign the materials' contract, the plaintiff himself testified:
"A. I knew that it, the agreement was off. I do things a lot different *842 than a lot of people, I made a man-to-man agreement with Lex Jenkins. Mr. Dunham at that time couldn't fulfill his agreement, and I took it back (the proposed contract of sale) and give it to Mr. Jenkins. What he did with it I don't know.
Q. But the original agreement was between Bay and Dunham, between Bay and Big "A" was conditioned upon Bay having a contract with Dunham for eighty-five percent of his business?
A. That's exactly right.'
The fact that Mr. Dunham subsequently expressed his willingness to sign the said materials' requirements' contract is of no moment, for being then engaged in negotiations relative to the sale of his concrete business, defendants understandably had no interest in pursuing his offer.
"The simple fact of the matter is that while defendants agreed to the interim arrangement of operating the assets of the plaintiff corporation in exchange for paying plaintiffs the amount of the monthly note, the Court is satisfied that they had no intention of being bound to purchase the said corporation until mutually satisfactory agreements were struck, reduced to writing, and signed by all parties. While plaintiff Sanders denied that this was the understanding between the parties, his own testimony, as well as that given by Ted Dunham, Jr., corroborates that of defendants on this point.
Mr. Sanders testified:
`Q. Was there any discussion that, between you and Mr. Dunham and the Jenkinses for Bay Sand & Gravel Co. that they could go on and start operations just so long as they paid the monthly rental and then the contract would come later?
A. No, sir. It was, it was just like this, Mr. Stewart. That they agreed that Mr. Dunham, after Mr. Dunham explained his situation, they agreed to go along with the agreement of buying the assets, buying the eighty-five percent contract, buying the Harvell lease, and produce it and selling to Dunham Concrete Co. and when Mr. Dunham was ready, if he got, when he, when he had this situation, Judge, that I couldn't answer just a moment ago why he couldn't sign it, when he, when he solved this situation then they would go ahead and sign it, and it would be an agreement. And while that was going on they would pay me the monthly note to the bank, and when they was to pay me I was to take the monthly and put it on the loan at the bank, and when they closed it this money would apply to it, and that's what they had owed, whatever was left that the payments was. That's the whole deal.' (Emphasis the Court's)
And Mr. Dunham testified:
`A... Mr. Sanders contacted
Mr. Jenkins and they met at the Oak Manor, and then they, and Mr. Jenkins came to my office for clarification, for confirmation of the percentage of the business.
Q. And you were in on the negotiations though?
A. I think they were pretty well negotiated out by the time they got to my office.
Q. But that particular contract, how was it to be done, was it supposed to be in writing?
A. Right.'
* * * * * *
`A. . . . Yes, it was in July of 1969, that the agreement was made and it was about August of 1969, that I told, that the documents were prepared and I found out that I was *843 involved in a problem, and I went to see Mr. and Mrs. Jenkins and told them about the problem, and told them that as far as, that we have been doing business for many years, and that I, as quickly as I could get my business straightened out, that I would sign the contract. But in the meantime Mr. Sanders had said he would apply whatever funds, the thirty-five hundred a month, to the bank to reduce this, the amount of the mortgage, and that the adjustments would be made in the amount, amount of the total purchase.' (Emphasis the Court's)
"Further evidence that this was the intention of the parties is found in the `letter of intent' executed in July of 1970, wherein reference was made to `... the agreement between the parties which is attached hereto and made a part hereof.' An `agreement between the parties' was not attached to the said document, and the Court is satisfied that its absence clearly establishes not only the fact that the instrument itself was not a contract, but also that a written contractual agreement was contemplated by all as necessary to effect the sale.
"This being so, and in view of all of the foregoing, the Court finds applicable the often cited language contained in the decision of the Supreme Court of Louisiana in Fredericks v. Fasnacht, 30 La.Ann. 117, to wit:
`... It is elementary in our law, that where the negotiations contemplate and provide that there shall be a contract in writing, neither party is bound until the writing is perfected and signed. The distinction is manifest between those cases in which there is a complete verbal contract, which the law does not require to be reduced to writing, and a subsequent agreement that it shall be reduced to writing, and those in which, as in this case, it is a part of the bargain that the contract shall be reduced to writing. In (the) first class of cases the original verbal contract is in no manner impaired by the failure to carry out the subsequent agreement to put it in writing. In the second class of cases, the final consent is suspended; the contract is inchoate, incomplete, and it can not be enforced until it is signed by all (the) patties. Villere v. Brognier, 3 Martin, [326] 349; Des Boulets v. Gravier, 1 [Martin] N.S. [420] 421, 422; Bloeker v. Tillman, 4 La. [77] 80.' (30 La.Ann. at 119)
"Also apropos the case at bar is the holding of the Supreme Court of Louisiana in Breaux Brothers Construction Co. v. Associated Contractors, Inc., 226 La. 720, 77 So.2nd 17 (1954), wherein it was found:
"Since the parties in the instant case intended from the beginning to reduce their negotiations to a written contract, neither the plaintiff nor the defendant was bound until the contract was reduced to writing and signed by them. Therefore, even if all of the terms of the alleged contract between plaintiff and defendant had been verbally agreed upon, no valid contract would have existed between the parties because this case falls within the second class of cases discussed in Fredericks v. Fasnacht, supra, and therefore in this case the final consent of the parties was suspended until such time as the contract should be reduced to writing and signed by all the parties.' (77 So.2nd at 20)
"Finally, the Court finds without merit plaintiffs' argument that having accepted the benefits of utilizing the assets of the plaintiff corporations, the defendants cannot repudiate their obligation. The short answer to this proposition is that defendants' only obligation was to cause payment of the monthly note pending the consummation of a contract of sale. The said contract was never effected, and the court takes cognizance of the fact that *844 the rather loose and lengthy interim arrangement was apparently never objectionable to plaintiffs until defendants elected to terminate the same. If the said arrangement was unsatisfactory to plaintiffs, the Court believes it was incumbent on them to so inform the defendants and to cause a determination of their respective rights and obligations. Plaintiffs were instead content to enjoy the benefit of the receipt of the monthly note payment, and thus cannot now be heard to complain of the benefits defendants received in return."
In addition to the conclusions of the trial court, we would add that Mr. Sanders knew that the proposed contract of sale had not been finalized. He certainly knew of his continuing obligation on Big "A"'s notes, because he picked up the check to pay these notes from Mrs. Jenkins and personally carried it to the Fidelity National Bank each month.
"Ruth would give me the check. She'd make it out to Big "A" Sand & Gravel. I'd in turn write the check out for the same amount to the Fidelity bank and take it to them and apply it on the note." (Deposition of Mr. Sanders, p. 111).
It is noteworthy that the arrangement Mr. Sanders had with Mr. Payne Fletcher was very similar to that he later had with defendants. As he admitted, he broke off the agreement with Mr. Fletcher not because it was a lease but because Tiger's trucks were not being used.
We are impressed with the honesty and candor of all the parties to this suit. On the whole, their accounts of the circumstances confirm each other.
This litigation is composed essentially of factual questions. We believe the trial judge, who heard the witnesses, has properly analyzed the facts and the applicable law. We find no manifest error in his conclusions of fact and we agree with his conclusions of law. Barnes v. LeBlanc, 207 La. 989, 22 So.2d 404 (1945); Orlando v. Polito, 228 La. 846, 84 So.2d 433 (1955); Readco Industries, Inc. v. Myrmax Specialties, Inc., 236 So.2d 573 (La.App. 1 Cir. 1970) writ refused 256 La. 865, 239 So.2d 362 (1970); McCann v. George, 238 So.2d 197 (La.App. 1 Cir. 1970), writ refused 256 La. 883, 239 So.2d 541.
There is evidence in the record to indicate that Big "A"'s equipment was not properly maintained by defendants. However, we are not presented with a claim for damages for improper maintenance.
All costs are taxed against plaintiffs-appellants.
Affirmed.
BLANCHE, J., concurs in the result and assigns written reasons.
BLANCHE, Judge (concurring).
I concur in the result but would not hinge the opinion upon the premise that the agreement was dependent on the formality of signing the agreement documents. The moving consideration for the Jenkinses was the contract with Dunham whereby Dunham would fill 85 percent of his sand and gravel requirements from the Jenkinses for a period of eight years. The evidence convinces me that only upon Dunham's unconditioned obligation (represented by his signing the contract) would Jenkins agree to assume Sanders' place on the Fidelity National Bank note. Millard Redden, Vice-President of the Fidelity National Bank, confirmed this when he testified that Jenkins made application to be substituted for Sanders "to take over the debt to our bank owed by Big `A' Sand on the same conditions, collateral as we had under Big `A.'" At that time Jenkins' understanding, as reflected by the evidence, was that Dunham would agree to let him supply 85 percent of his sand and gravel requirements. However, Dunham never came through with the 85 percent contract for eight years, and the requisite element of consent was lacking for the establishment of a valid contract under LSA-C.C. Art. 1779.
*845 Initially, Dunham refused to obligate himself on such a contract because of its possible interference with a proposed business merger which he was then contemplating. Sanders testified that when this occurred he knew the agreement was off. However, upon Dunham's assurance that he would eventually obligate himself when his business affairs would permit, the Jenkinses began to operate the lease and began to make payments to Sanders who, in turn, paid the bank.
Finally, Dunham, only a month before he agreed to sell his concrete business to Clegg, announced that he was ready to sign the contract (and obligate himself) as to the sand and gravel requirements which were originally proposed to the Jenkinses. With this assurance, Jenkins signed the letter of intent wherein he acknowledged his personal liability for the purchase of Big "A." In my opinion, this was no more than he was willing to do when he made his inital agreement with Sanders.
However, again Dunham failed to come through, because Clegg, with whom he was negotiating for the purchase of Dunham's concrete business, would only agree to a contract for 50 percent of the sand and gravel business with the Jenkinses. At this point Mrs. Jenkins testified that she told Dunham they could not sign the note at the bank and personally obligate themselves to Big "A." She claimed that Dunham stated that he didn't care if they ever signed the note as long as they made the payments to the bank. This was denied by Dunham, although the evidence shows this is exactly what the Jenkinses did, i. e., pay the note each month without personally obligating themselves until they finally terminated their arrangement with Sanders on March 4, 1971.
While Sanders was never consulted during the Jenkins-Dunham-Clegg contract negotiations, he likewise never demanded that Jenkins sign the contract documents, nor was he in a position to do so since his agreement with the Jenkinses was for 85 percent of Dunham's sand and gravel requirements. By this time the fulfillment of the earlier agreement was impossible because of the Dunham sale to Clegg and Clegg's refusal to obligate himself for more than 50 percent of his sand and gravel requirements from the Jenkinses.
Thus, Jenkins never got what he bargained for, and for this reason he should not be held liable for the purchase of Big "A" Sand and Gravel Company.