S. C. LOVELAND, INC., Plaintiff,

v.

EAST WEST TOWING, INC., E. & I., Inc. in personam, and the TUG MISS CAROLYN, her engines, tackle, furniture, appurtenances, etc., in rem, Defendants.

STATE OF FLORIDA, DEPARTMENT OF TRANSPORTATION, Plaintiff,

v.

S. C. LOVELAND, INC. and East West Towing, Inc., in personam and the TUG MISS CAROLYN, her engines, etc. and the BARGE LOVELAND 34, in rem, Defendants.

ST. PAUL MERCURY INSURANCE COMPANY et al., Plaintiffs,

v.

EAST WEST TOWING, INC., Defendant.

Nos. FL 73–43–Civ–NCR, FL 73–61–Civ–NCR and FL 74–396–Civ–NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

May 21, 1976.

Christian D. Keedy, of Smathers & Thompson, Miami, Fla., for S. C. Loveland, Inc.

Geoffrey B. Dobson, Tallahassee, Fla., for State of Florida, Dept. of Transportation.

William L. Von Hoene, New Orleans, La., Dewey R. Villareal, Jr., of Fowler, White,

Gillen, Boggs, Villareal & Banker, Tampa, Fla., for East West.

Theodore G. Dimitry, of Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., for St. Paul Mercury Ins., et al.

Ron FitzGerald, of Fleming, O'Bryan & Fleming, Ft. Lauderdale, Fla., for E. & I., Inc. and tug MISS CAROLYN.

ROETTGER, District Judge.

These three admiralty cases arose out of a collision between a barge which dragged anchor at its anchorage in the mouth of Tampa Bay and crashed into the Sunshine Skyway Bridge, owned by the State of Florida.

Shortly after the collision, the barge owner S. C. Loveland Inc., brought suit against the tug MISS CAROLYN in rem and against East West Towing, Inc. and E. & I., Inc. in personam. East West Towing and E. & I., the past and present owners of the tug MISS CAROLYN, cross-claimed against each other for damages resulting from any liability to plaintiff.

Shortly thereafter, the State of Florida filed suit against S. C. Loveland, Inc. and East West Towing in personam and against the tug MISS CAROLYN and the barge LOVELAND 34, in rem. S. C. Loveland cross-claimed against East West Towing and the tug MISS CAROLYN.

St. Paul Mercury Insurance Company and two other insurance companies sought a declaratory judgment to declare the policy of insurance issued to East West null and void because of its alleged change of ownership or management of the vessel without written consent of the underwriters. Both S. C. Loveland, Inc. and E. & I. intervened, asserting an interest as potential beneficiaries of the policy.

The suits were consolidated for purposes of pleading and trial. Findings of fact and conclusions of law will be set forth in this memorandum opinion.

### FINDINGS OF FACT

E. & I., Inc., a Florida corporation, had a contract for purchase of the tug MISS CAROLYN for $175,000 from East West Towing, Inc., a Louisiana corporation. The closing had been delayed a couple of times and the final closing date was set for August 17, 1973. On the 16th of August representatives from E. & I., Mr. Manion and Capt. Landreth, flew to New Orleans expecting to hold a closing. By then the condition of obtaining financing had been satisfied so that the closing could proceed. When the E. & I. representatives arrived in New Orleans, the tug MISS CAROLYN was not in port; instead she had been dispatched with a tow by East West Towing on the 14th of August and was en route to Florida. The original contract of towage had been modified to extend her destination to Jacksonville rather than Tampa.

The tow was the barge LOVELAND 34, an unmanned (dumb) 115 feet steel barge with about 2½ feet of freeboard. The barge had no fixed superstructure and was carrying a cargo of two large objects which were chemical reactors.

E. & I. had expected to take command of the tug MISS CAROLYN and depart for Grand Cayman immediately after the closing and had charts for that intended voyage. Since the tug MISS CAROLYN was not in port, East West and E. & I. found themselves engaged in further negotiations. East West desired E. & I. to take over the tow but E. & I. declined; they did not have the appropriate towing liability insurance and did not want to secure it because of the costs involved.

The testimony was unequivocal that the sale would not go through unless arrangements could be made for East West to complete the tow. East West tried to obtain the services of a tug in Tampa but was unable to do so. Consequently, the parties agreed on an arrangement whereby East West would dispatch the tug GARY STEPHENS to cross the Gulf directly to Tampa. There it would take over the tow from MISS CAROLYN when she arrived in the Tampa area.

The court finds that it was the clear intention of the parties that command of the tug MISS CAROLYN would not be

turned over to E. & I. until the tow had been taken to Tampa Bay. The court further finds that it was the intention of the parties that the tow would be taken over in the Tampa Bay area by the tug GARY STEPHENS which, although owned by Delta Boat & Barge, was operating under the authority of East West. The testimony of all the witnesses of East West alone compels the finding that no documents of sale would have been executed by E. & I. for the purchase of the vessel absent the agreement to permit the GARY STEPHENS to pick up the tow in Tampa. E. & I.'s witnesses add further support to that finding. The documents were executed on the night of August 16th and the respective parties celebrated the occasion that evening in New Orleans.

Meanwhile, by noon on the 16th the tug MISS CAROLYN had arrived at Panama City, Florida with her tow and stopped there. Jay Landreth was flown to Panama City on the afternoon of the 16th and went aboard the tug MISS CAROLYN. The ship's license was brought back by the pilot of the seaplane and given to the lender's agent as required by the lender prior to the disbursing of funds.

In the first of a series of unusual errors in communication, an East West officer, Mr. Dupre, called the captain on MISS CAROLYN, Capt. Verdin, that same afternoon and advised him that the boat was sold. Evidently he did not further advise Capt. Verdin that the sale was conditioned on the tow being completed by East West with the tug GARY STEPHENS picking up the tow at Tampa. This created the unusual situation of Capt. Verdin thinking the boat had been sold when the contract purchaser's skipper, Capt. Landreth, came aboard in Panama City.

The court specifically finds that Capt. Landreth had no intention of taking over command and did not do so at Panama City. Capt. Verdin retained command although he was clearly in an Alphonse-Gaston situation with Landreth in the sense that he was seeking Landreth's advice and, perhaps, even deferring to Landreth on occasion.

The court finds there is an extremely sound reason why Capt. Verdin would do that: he had never been to the Tampa area—in fact, he had never been east of Panama City—while Capt. Landreth had experience in Tampa waters.

This scene aboard the tug MISS CAROLYN at Panama City was a bit unusual: the crew advised Landreth they couldn't go on because they had no fuel. They had no groceries. They had no charts. In fact, they were navigating by means of a Texaco road map. There was some evidence that they had planned to pick up charts in Louisiana before leaving but had failed to do so. Since the barge must proceed outside from Apalachicola to Tampa, Landreth checked the compass and found it had a deviation of more than 50 degrees; Landreth plotted a course to compensate for that compass error and subsequently the tug MISS CAROLYN left for Tampa.

Before they departed Panama City Landreth gave money to one of the crew members to obtain groceries; Landreth also obtained fuel at the Gulf docks where the tug was tied up. The testimony was uncontradicted that E. & I. would be reimbursed for the fuel used by the tug in getting the tow to Tampa.

The court observes that Capt. Verdin had a license for inland and western waters but not for open water. Capt. Verdin had only two or three months of formal schooling in his life. Apparently, he did not know where Jacksonville was and expressed surprise to Capt. Landreth at the distance from Panama City to Jacksonville.

Somewhere en route to Tampa about 3 A.M. on the 18th Capt. Verdin got lost, then woke up Landreth, who took the wheel. This squares with the marine operator's report that there was a call from the tug MISS CAROLYN requesting navigational assistance about that time on the morning of the 18th. When the tug MISS CAROLYN got to the mouth of Tampa Bay, where it is spanned by the Sunshine Skyway Bridge, there was a discussion between Capt. Verdin and Capt. Landreth about where to anchor the barge. Finally, the

anchorage site in the spoil banks, just east of the Sunshine Skyway Bridge on the south side of the channel, was selected and the barge was anchored there about 10 A.M.

There is no evidence before the court that there was anything other than sufficient cable payed out for the anchor. The tug MISS CAROLYN continued on to the Nilo Docks in Tampa located about 30 miles and a three-hour run from the anchorage. East West has urged throughout the trial that there was some urgency on the part of E. & I. to get the boat to Fort Lauderdale and that was the reason for anchoring the barge in the spoil banks. However, that does not square with the evidence.

The court finds that the only purpose in leaving the barge in that location is so that it would be convenient for the tug GARY STEPHENS to pick it up. It could not be a benefit to E. & I. because E. & I. had already made arrangements for their personnel to meet the tug MISS CAROLYN at the Nilo Docks in Tampa. MISS CAROLYN arrived at the Nilo Docks on the afternoon of the 18th and Capt. Verdin contacted East West. At that time the crew of E. & I. which was to take the tug around to Fort Lauderdale had not left Fort Lauderdale and did not arrive in Tampa until about 11 P.M. Further, MISS CAROLYN didn't leave until the afternoon of the 19th and had to make the three-hour run again from the Nilo Docks to proceed seaward from Tampa Bay.

The court finds that dropping the barge off at the spoil banks anchorage was not for the benefit of E. & I. but solely for the benefit of East West. That is further corroborated by the testimony of Mr. Manion who received a call on the 18th from the MISS CAROLYN about leaving the barge at anchor; he stayed on the marine phone to the tug and called Dupre of East West on a land line to see what to do. Dupre advised Manion that he had just talked to the tug GARY STEPHENS which said it was only three or four hours from Tampa and that he could see no reason to take the tow on to Nilo Docks.

Whatever change of command ceremony occurred for the tug MISS CAROLYN did not occur until MISS CAROLYN had been tied up at the Nilo Docks. Not until then did Landreth assume command and control of the tug for E. & I.

Meanwhile, the whereabouts of the tug GARY STEPHENS remains a bit of a mystery because the evidence is rather muddled. Buras of East West testified that GARY STEPHENS was sent across the Gulf to Tampa in accordance with the agreement in New Orleans. Otherwise, the tug would inevitably be several days behind MISS CAROLYN if it tried to track the route of MISS CAROLYN. Unfortunately, no one explained this to Capt. Ellis of GARY STEPHENS who testified that he proceeded via Panama City.

The court takes judicial notice that it is about 400 nautical miles from Venice, Louisiana to Tampa Bay; travelling at 10 knots light boat GARY STEPHENS should have been there in the evening of the 18th or no later than the morning of the 19th. Even though there was some testimony by Capt. Ellis concerning an air compressor breaking down on the 19th causing him to run at half speed thereafter, he would already have been at Tampa Bay had he proceeded across the Gulf.

Although GARY STEPHENS apparently was in Panama City at the time of anchoring the barge, East West was telling people that the tug was two to three hours out of Tampa; consequently, there was little reason for anyone to worry about anchoring the tow in spoil banks on the 18th. Two disinterested witnesses, marine operators Mr. Pope and Mr. Burtle, said there was an indication GARY STEPHENS was in the Egmont Channel near Tampa Bay when MISS CAROLYN sent a message that it was going to drop the barge by the Skyway Bridge.

The final confusion about the whereabouts of GARY STEPHENS was found in its log, viz. the entry at 2 P.M. on the 20th of August: "in Tampa Bay looking for the barge LOVELAND 34." The log entry is incomprehensible because the tug, in order

to enter Tampa Bay, would have gone close by the barge which was within a stone's throw by maritime distances from the channel and just east of the Sunshine Skyway Bridge. Regardless of where the tug GARY STEPHENS was, it wasn't there when the ship hit the span; and its failure to be there was solely the fault of East West.

## THE BARGE

Neither the Coast Guard nor the American Bureau of Shipping required that the barge have an anchor. However, the barge did possess a five-hundred pound Danforth anchor which was suitable under the standards of the American Bureau of Shipping for a barge of its size with no fixed superstructure. However, Loveland's expert witness conceded that if the cargo aboard the barge had been considered a fixed superstructure, a seven hundred fifty pound Danforth anchor would have been required.[1]

S. C. Loveland, the executive head of Loveland expected East West to provide him with the morning position report which Ms. Buras of East West was to obtain from the tug. East West was also to report any irregularities to him. East West did not advise Loveland of a contract for sale or closing as to the tug MISS CAROLYN. Loveland called Ms. Buras in the evening of the 18th and was told the tug was leaving Tampa that evening. (East West's crew had disembarked about 6 P.M.) On the 19th Loveland received no position report and called East West at noon. For the first time Loveland learned that the barge was being towed—or supposed to be—by GARY STEPHENS, but East West had no position report for the barge or GARY STEPHENS. Somewhat concerned, Loveland called the bridges over the Intracoastal Waterway from Tampa south to Fort Myers and learned that the tow had not passed their location. On the morning of the 20th Ms. Buras of East West had no position report;

Loveland called the bridge at Fort Myers but it had no record of the tow. Becoming increasingly concerned, Loveland called the Tampa port authority on the 20th. When they did not call back, he called the Coast Guard in the morning; after lunch they reported that they had no sighting of the barge. Then Loveland called East West and talked with Mr. Dupre who did not know where the tug or barge was. At 4:21 E.D.T. Loveland sent a telegram:

"MR OR MRS BURAS: WE ARE DEEPLY CONCERNED ON RECEIVING YOUR ADVICE THAT THE TUGS [SIC] GARY STEVENS [SIC] HAS BEEN SUBSTITUTED FOR THE TUG MISS CAROLINE [SIC] IN PROVIDING TOWING SERVICES FOR OUR BARGE LOVELAND 34 ENROUTE FROM NEW ORLEANS TOWARDS JACKSONVILLE FLORIDA WE ARE FURTHER CONCERNED THAT NO RESPONSIBLE OPERATING OFFICIAL OF YOUR ORGANIZATION KNOWS THE WHEREABOUTS OF THE TUG NOR THE ROUTING WE NEVER EMPLOY A TUG WITHOUT INSPECTING IT AND ITS TOWING GEAR WE WILL HOLD YOU FULLY RESPONSIBLE FOR ANY DAMAGE TO THE BARGE AND ITS CARGO OR ANY EXPENSE INCURRED RESULTING FROM THIS SUBSTITUTION AND POSSIBLE ROUTING AROUND KEY WEST WITHOUT OUR AUTHORITY"

Later that evening the Coast Guard in St. Petersburg called Loveland and advised him that the barge was against the bridge. Loveland called a firm in Tampa and hired a tug; within 30 minutes the tug ONSLOW was underway and took the barge from the Coast Guard cutter between nine and ten o'clock, shortly after the cutter had taken the barge from the bridge.

## THE BRIDGE

At first blush it seems unlikely that a fixed object, such as a bridge—especially

1. This raises serious questions about the reliability of such standard, particularly since the two large reactors necessarily provided similar wind resistance to a fixed superstructure of equivalent size.

one as large as the Sunshine Skyway [2] could be guilty of any negligence. However, the evidence was uncontradicted that the barge dragged anchor on the afternoon of the 19th, the day before the collision and drifted closer to the bridge. This occurred during a thunderstorm and the barge moved from the south side to the north side of the channel. The bridge's owner, the State of Florida, called the Coast Guard but did nothing more.

Again on Monday, the 20th, the Coast Guard was notified that the barge was drifting dangerously close to the bridge. The bridge tender had called the bridge foreman for the State of Florida Department of Transportation between 3:00 and 3:30 on the 20th; and the Coast Guard was called between 4:00 and 4:30. The bridge tender called again between 5:00 and 6:00 o'clock and warned that the barge was drifting towards the bridge; again the bridge foreman called the Coast Guard. Shortly thereafter the toll taker called during a rain squall to advise that the barge was up against the bridge.

The Coast Guard tender did not arrive until later in the evening. The bridge was shaking back and forth during the storm with the barge rubbing alongside. Approximately 15 minutes was required for the Coast Guard to haul the barge away from the bridge. The testimony was uncontradicted that there were thunder showers, in fact a squall, on both the afternoons of the 19th and 20th. The weather on the 18th had been considerably better. The court finds that afternoon thunderstorms in August are a common and foreseeable occurrence in the Tampa Bay area.

The employees on the bridge had been watching the barge with binoculars and could identify it. A number of options were available to the State other than merely calling the Coast Guard repeatedly as they watched the barge drift closer: (1) After learning the barge's identity, a check could have been made as to the owner of the barge and a call placed to S. C. Loveland. Mr. Loveland's frantic activity in trying to locate the barge and prompt action after learning of its whereabouts indicates Loveland would have taken the necessary steps to have the barge taken under tow. (2) A local towing service could have been called. From the quick action of the tug ONSLOW, such action on the part of the State would have prevented the collision. Although it would have required perhaps some expense on the part of the State, the tug would have had a lien on the barge so that any such preventive action would have resulted in no expense—and more importantly, no damage—to the State.

However, the Department of Transportation did nothing more than call the Coast Guard and watch the barge drift into the side of the bridge, thereby causing one span (two lanes) to be closed. The failure to take sufficient action was unjustified since this was not the first time that a vessel had drifted into the bridge: a Liberty Ship and at least one other barge had previously done so.

## DAMAGES TO THE BRIDGE

The State of Florida paid a sum of $123,025.47 on the original contract for repairs. The court disallowed a supplemental charge of $18,000 and the overhead charge in the amount of $4,940.25 as unreasonable charges.

## DAMAGES TO THE BARGE

No dispute is made as to the amount of damages to the barge: $2743.64.

## INSURANCE QUESTIONS

The insurance policy covering MISS CAROLYN, with East West Towing, Inc. as the named insured, contains a number of pertinent endorsements: endorsement # 24 is dated August 16, 1973 and extends the

---

2. The bridge's dimensions speak for its size: main channel clearance is 800 feet horizontally with a vertical clearance of 140 feet above the mean high water line. Its north trestle approaches exceed one mile in length while the south one exceeds two miles; the channel approaches and clearance span are 5621 feet long.

navigation warranty for the tug MISS CAROLYN to inland and coastal waters between Brownsville, Texas and Jacksonville, Florida. The effective date of this endorsement is August 10, 1973. Endorsement # 25 to the same policy, extending the navigation warranty for the tug GARY STEPHENS to the inland and coastal waters between Brownsville, Texas and Port of New York, is dated August 21, 1973 and was made effective August 20th, 1973.[3]

Mr. Buras of East West testified that he told his insurance agent on the 17th that he had sold MISS CAROLYN and that she had a tow. He discussed the whole matter with the agent, advising him that the regular captain [Verdin] was aboard and that the representative of E. & I. was also aboard. The agent assured him not to worry about it and that "he would take care of it". In addition, East West never received any premium refund for the period August 16th to the 21st.

Endorsements # 26 and # 27 delete the tug MISS CAROLYN from the policy, effective August 21, 1973 and provide for a return of premium from August 21, 1973. These endorsements were dated September 19, 1973 and the date of August 21st was arrived at after the collision.

### CONCLUSIONS OF LAW

█ This court has admiralty jurisdiction over the collision of the unmanned barge LOVELAND 34 (barge) with the Sunshine Skyway Bridge (bridge).

### Liability of East West and the Tug MISS CAROLYN

█ East West and the tug MISS CAROLYN entered into a contract of towage of the barge LOVELAND 34 with S. C. Loveland to tow the barge from New Orleans to Jacksonville. East West and the tug MISS CAROLYN accepted responsibility for the safety and care of the barge at the begin-

ning of the voyage. The responsibility is a continuing one which terminates only when the tow is safely anchored at its ultimate destination. See *Allied Chemical & Dye Corp. v. Tug Christine Moran,* 303 F.2d 197 (2d Cir. 1932); *United States v. Powell Bros. v. Barge No. 128,* 249 F.Supp. 553 (S.D.Fla.1965). If delivery cannot be made as planned, then it is the duty of the tug to tie its tow in a safe place, free and clear of any obstructions, and protect it until delivery can be made. See *Allied Chemical & Dye Corp. v. Tug Christine Moran,* supra; *Gulf Oil v. Tug Gulf Explorer,* 337 F.Supp. 709 (E.D.La.1971). Thus, the duty of East West and the tug MISS CAROLYN to care for, protect and render assistance to the barge was not terminated or suspended when the barge was at anchor in Tampa Bay.

█ East West and the tug MISS CAROLYN owed the barge an implied warranty of workmanlike service; that is, a duty to perform its towing services properly and safely, once having undertaken the responsibility. See *Fairmont Shipping Corp. v. Chevron International Oil,* 371 F.Supp. 1191 (S.D.N.Y.1974); *Singer v. Dorr,* 272 F.Supp. 931 (E.D.La.1967). Although a tug is not liable as an insurer against any damage to its tow or caused by its tow while under its custody and control, a tug owes its tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services and to man the tug with competent personnel. See *Stevens v. The White City,* 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); *Hart v. Blakemore,* 410 F.2d 218 (5th Cir. 1969); *Stall & McDermott v. The Southern Cross,* 196 F.2d 309 (5th Cir. 1952); *Gulf Corp. v. Gulf Tug Explorer,* supra.

█ East West and the tug MISS CAROLYN breached its contract of towage and were negligent in leaving the barge unat-

---

**3.** It is interesting to note that endorsement # 23 dated August 16, 1973 names Delta Boat & Barge Rental Inc. as an additional insured under the policy. Delta Boat & Barge was the owner of the tug GARY STEPHENS and the date of the endorsement squares with the agreement of that date to send GARY STEPHENS across the Gulf of Mexico to take over the tow.

tended in an exposed area in close proximity to the bridge from the morning of August 18th until the afternoon of August 20th. East West and the tug MISS CAROLYN failed to exercise reasonable care by improperly anchoring the barge in a spoil bank, in failing to take any measures to protect and safeguard the barge once anchored and further in failing to inform the owners of the barge of the change in circumstances. Cf. *L. R. Connett & Co. v. The Republic No. 5,* 43 F.Supp. 245 (S.D.N.Y. 1941).

The tug MISS CAROLYN, under the control and management of the crew employed by East West, was negligent in anchoring its tow in spoil banks and leaving it unattended rather than taking the tow to the Nilo Docks. The court finds that this negligence, which continued up until the time of the collision, was a proximate cause of the collision for which East West is responsible in personam and for which the tug MISS CAROLYN is responsible in rem.

The consequences of leaving an unmanned barge in the middle of Tampa Bay for a two day period, in an exposed area and with the reasonable likelihood of adverse weather conditions, was entirely foreseeable to those who undertook responsibility for the care and safety of the barge. Thus, the tug MISS CAROLYN and East West owed a duty of care to all those within the reach of the barge's destructive power. See *Petition of Kinsman,* 338 F.2d 708, 722 (2d Cir. 1964).

■■■ The court further finds that East West and the tug GARY STEPHENS were negligent in failing to promptly pick up the barge which had been left unattended and the crew of the tug GARY STEPHENS was negligent in failing to come to the aid of the barge prior to the time the barge dragged anchor and drifted into the bridge. East West was further negligent in failing to obtain a relief tug after it knew or should have known that the barge was left unattended in an exposed area in close proximity to the bridge. The court finds that this negligence of East West was separate and distinct from the negligence of the

tug MISS CAROLYN in leaving her tow unattended and that this negligence also proximately contributed to the collision of the barge with the bridge. Since the court has no in rem jurisdiction over the tug GARY STEPHENS, the negligence attributed to the tug GARY STEPHENS must be assessed against East West in personam. See *Platoro Limited v. Unidentified Remains of a Vessel,* 508 F.2d 1113 (5th Cir. 1975); *Dow Chemical v. Barge UM–23B,* 424 F.2d 307 (5th Cir. 1970).

### *Exoneration of S. C. Loveland and its Barge*

■■■ The barge owed the tug MISS CAROLYN a warranty of seaworthiness. In order to be seaworthy, the barge need only be reasonably fit for its intended purpose. See *Gutierrez v. Waterman SS Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). A vessel's purpose establishes the standard by which the warranty of seaworthiness must be judged. *Parker v. S/S Dorothe Olendorff,* 483 F.2d 375 (5th Cir. 1971), cert. den. 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 110 (1974). The barge was an unmanned vessel; while under the exclusive custody and control of its tug the barge's ground tackle was only intended to be used in emergencies for short periods of time and was reasonably fit for its intended purposes. The size of the anchor conformed to the standards established by the American Bureau of Shipping. A competent crew would have reason to know of the limited purposes for which the anchor was to be used, as established by the testimony of Captain Landreth. Under the circumstances, the failure to have a heavier anchor did not render the barge unseaworthy. See *Powell Bros. v. Barge No. 128,* supra. In any event the proximate cause of the collision was the failure of the tug MISS CAROLYN to properly care for and protect the unmanned barge, after anchoring it in an exposed area. Cf. *Gulf Oil v. Gulf Tug Explorer,* supra.

■■■ The warranty of seaworthiness does not inure to the benefit of the bridge or to any other stationary object. See *The*

*Cullen No. 32,* 62 F.2d 68 (2d Cir. 1932), aff'd 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189 (1933); *Petition of Mahoney,* 255 F.Supp. 310 (D.N.H.1966). The duty of a barge to a bridge is based on negligence; however, the duty to exercise reasonable care is circumscribed by the fact that the barge was unmanned and under the exclusive custody, care and control of the tug MISS CAROLYN pursuant to a contract of towage. Cf. *Allied Chemical & Dye v. Tug Christine Moran; Gulf Oil v. Tug Gulf Explorer,* supra. By relinquishing the custody of the barge to the tug MISS CAROLYN, the barge and its owners were entitled to rely on the competence of the tug to fulfill the task for which it contracted; that is, to safely and properly tow the barge to its ultimate destination. Under the circumstances, the risk to which the barge was exposed and the resulting collision were not foreseeable. Therefore, the court concludes that the barge and its owners, S. C. Loveland, were not negligent. Under the circumstances, S. C. Loveland exercised reasonable care for the safety of its barge, including taking all possible measures to ascertain the whereabouts of its barge.

### Exoneration of E. & I.

E. & I. never assumed a contract of towage, never assumed any duty or responsibility for the safety and protection of the tow. The decision to anchor the barge in the exposed area in Tampa Bay was the decision of the crew of East West and the tug MISS CAROLYN and not the decision of E. & I. Therefore, E. & I. is not liable for the collision of the barge with the bridge.

### Liability of State of Florida

The State of Florida, Department of Transportation has a duty to exercise reasonable care and take reasonable precautions for the safety and protection of its own property. The court finds that the State of Florida, through its agents, breached this duty and is therefore negligent. The court finds that the negligence of the Department of Transportation was a proximate cause of the collision of the barge with its bridge and the resulting damage to its bridge and the damage incurred by S. C. Loveland.

Specifically the court holds that the Department of Transportation was negligent in taking no action to prevent the drifting barge from colliding with its bridge other than contacting the Coast Guard. No efforts were made to determine the ownership of the barge, to attempt to contact the owner or to summon any of the many tugs in the Tampa Bay area to come to the assistance of the apparently abandoned barge. Since the occurrence of severe thunderstorms is not unusual on August afternoons in the Tampa Bay area, the possibility of an eventual collision with the bridge was foreseeable to the agents of the Department of Transportation watching the barge drift in the direction of the bridge, particularly since a cargo ship and at least one barge had previously hit the bridge.

### Last Clear Chance

Although the State of Florida, Department of Transportation was the only party who was not sued by any other party in this consolidated litigation either directly or by counterclaim or crossclaim, it now finds itself in a situation in which East West seeks to shift the entire burden of blame to the Department of Transportation for the damage to its bridge under the doctrine of last clear chance.

The court does not find the doctrine of last clear chance applicable under the circumstances of this case where the subsequent wrongful act or failure to act of the Department of Transportation did not break the chain of causation set in motion by the tug's initial act of leaving the barge unattended near the bridge, which negligence combined with the continuing negligence of East West and the tug GARY STEPHENS, continued up to and constituted a substantial proximate cause of the collision.

The doctrine of last clear chance has been applied selectively in admiralty collision

cases primarily because of the application of the now-discarded division of damages rule and, in fact, at times merges with the "major-minor fault" exception. See *Petition of Kinsman Transit Company,* supra, at 719–720. In one line of cases, the doctrine has been applied where a vessel committing the later fault was contractually bound to care for the one guilty of the earlier fault of which the vessel held solely liable had become aware. See *Chemical Transporter v. M. Turecamo,* 290 F.2d 496 (2d Cir. 1961); *Houma Well Service, Inc. v. Tug Capt. O'Brien,* 312 F.Supp. 257 (E.D.La.1970). In another line of cases, the last clear chance doctrine is applied selectively to free a claimant from the consequences of a rather low degree of negligence in creating a dangerous situation of which the other party was aware and which could easily have been overcome by a simple change in navigation. See *Petition of Kinsman,* supra, at 720, citing Gilmore and Black, *The Law of Admiralty,* 404 and fn. 47. In still another line of cases, courts loosely refer to the doctrine of last clear chance when the earlier negligent act was simply not a proximate cause of the collision. See *Crawford v. Indian Towing Co.,* 240 F.2d 308 (5th Cir. 1955).

The facts of this case most closely resemble *Petition of Kinsman,* supra, where an unmanned vessel became unmoored and crashed into the center of a bridge owned and operated by the City of Buffalo. The district court had found that the City of Buffalo was negligent in failing to raise the bridge before the drifting vessel collided and rendered the City solely liable under the doctrine of last clear chance, despite the earlier negligence of the wharfinger and a second vessel. The Court of Appeals refused to apply the doctrine of last clear chance under the circumstances, since the negligence of the wharfinger and the second vessel which had caused the vessel to become unmoored was not minimal and since the City of Buffalo was certainly not contractually bound to care for the vessels which had become unmoored. The Court of Appeals held that it would be a far cry from the selective application of the doctrine of last clear chance in admiralty collision cases to impose sole liability on the City of Buffalo and to exempt the vessel and the wharfinger from all liability for demolishing the City's property. Instead, it applied the doctrine of divided damages and approved a three-way division of damages between the City of Buffalo, the wharfinger and the owner of the second vessel.

## APPORTIONMENT OF DAMAGES

On May 19, 1975, the Supreme Court abrogated the century-old rule of *The Schooner Catherine v. Dickenson,* 17 How. (58 U.S.) 170 (U.S. 1855), requiring the equal division of property damages in cases involving maritime collisions. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). In its stead, the court adopted the rule requiring the damage to be

"allocated among the parties proportionately to the comparative degree of their fault [except] when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault."

*Id.* at 411, 95 S.Ct. at 1716, 44 L.Ed.2d at 262.

■ The fault in this collision must be apportioned among the tug MISS CAROLYN in rem, the tug GARY STEPHENS through its owners East West in personam, and the Bridge through its owners, the State of Florida Department of Transportation. Therefore, the court apportions fault as follows: 25% to State of Florida Department of Transportation, 50% to the tug MISS CAROLYN in rem, and 25% to East West in personam for its own fault as well as that of the tug GARY STEPHENS.

■ The court notes that the in rem liability of the tug MISS CAROLYN continues even though the tug underwent a change of ownership prior to the collision and even though the collision occurred through no fault of her present owners, E. & I. Judge Learned Hand in *Burns Bros. v. Central R. R. of New Jersey,* 202 F.2d 910 (2d Cir. 1953) explains the basis for the in

rem liability of the vessel imposed without concern over whether the owner is actually at fault as a "vestigial devolution out of the [animistic] notion that anything that moves and kills a man shall be deodand to the king." *Id.* at 912. The guilt attaches to the thing by which the wrong has been done. Thus, in Edward the First's time:

> "If a man fell from a tree, the tree was deodand. If he drowned in a well, the well was to be filled up. It did not matter that the forfeited instrument belonged to an innocent person."

*Id.* citing Holmes, *The Common Law.* Thus, the court is faced with the incongruous result that by imposing in rem liability on the tug MISS CAROLYN, an innocent party is forced to respond in damages because of the subsequent change in ownership.

### Indemnification—E. & I. and S. C. Loveland

█ Under the wording of the contract of sale of the vessel, however, it is clear that E. & I. is entitled to contractual indemnification for any judgment it is required to pay arising from the in rem liability caused by the acts of East West and arising during the time that East West had management and control over the tug MISS CAROLYN.

█ S. C. Loveland is entitled to indemnification from East West for its costs and reasonable attorneys' fees incurred in successfully defending the claims asserted against it by the State of Florida Department of Transportation under the rationale of *Dow Chemical Co. v. Barge UM–23B,* 424 F.2d 307 (5th Cir. 1970), which is a theory of indemnification distinct from the *Ryan* doctrine. Although East West was not an insurer of the barge LOVELAND 34, East West undertook responsibility to safely and properly tow the barge to its ultimate destination, pursuant to the oral contract of towage. The owners of the barge LOVELAND 34 entrusted the custody and control of its barge to East West and the tug MISS CAROLYN. East West and the tug MISS CAROLYN breached their duty under the contract of towage by negligently allowing the barge to collide with the Skyway Bridge.

As between East West and Loveland, East West was certainly the party best situated to prevent the accident, since Loveland was without knowledge of the circumstances which led to its barge being anchored in the Tampa Bay area for over a two day period and was reasonably entitled to reply on its contract of towage with East West to safely tow its barge to the Jacksonville area.

As S. C. Loveland recognizes, it is only entitled to its attorneys' fees incurred in defending the action brought by the State of Florida and not those attributable to prosecuting its cause of action in FL 73–43–Civ–NCR for its own damages, intervening in FL 74–396–Civ–NCR or in prosecuting its action for indemnity. See *Cotten v. Two "R" Drilling Co.,* 508 F.2d 669 (5th Cir. 1975.)

### Damages

The court has found that the State of Florida Department of Transportation has sustained damages in the amount of $123,025.47. Because the court has found the State of Florida to have contributed to the collision, the State of Florida is entitled to recover 75% of its damages from the tug MISS CAROLYN in rem and East West in personam.

The court has found that Loveland is entitled to recover damages it reasonably incurred in connection with the collision of its unmanned barge with the Skyway Bridge in the amount of $2743.64. Loveland would ordinarily be entitled to recover these damages from the State of Florida, the tug MISS CAROLYN in rem and East West in personam, recovering its damages jointly and severally. *The Alabama,* 92 U.S. 695, 23 L.Ed. 763 (1876). However, Loveland made no claim against the State of Florida. Therefore, Loveland is entitled to collect its damages in full from either the tug MISS CAROLYN in rem or East West in personam. *The Alabama,* supra; see *Pure Oil Co. v. Fred B. Zigler,* 105 F.Supp. 121 (E.D.La.1952). Similarly, the tug MISS

CAROLYN cannot recover contribution from the State of Florida since she did not assert a claim against it. Cf. *Cooper Steve-doring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); *Petition of Kinsman,* supra. However, East West has filed an amended answer and a counterclaim against the State of Florida Department of Transportation. It is clear that, despite the joint and several liability of the tug MISS CAROLYN in rem and East West in personam, those parties are entitled to contribution, and indemnification where appropriate. *Petition of Bloom-field Steamship Company,* 422 F.2d 728 (2d Cir. 1970). Therefore, the damages suffered by S. C. Loveland are apportioned at two-thirds by the tug MISS CAROLYN in rem, and at one-sixth each against East West, in personam and the State of Florida,[4] although each remains jointly and severally liable to Loveland. See *The Alabama,* supra.

### Insurance Policy

■ This court has jurisdiction over the interpretation of a marine policy of insurance under its admiralty jurisdiction.

Management is not limited to the specific person or persons having navigational control over the vessel. In *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940) the Supreme Court interpreted the term "management" within the context of the admiralty materialmen's lien statute to mean the person or entity having direction and control over the purposes for which the vessel is used such as to what port she shall go and what she shall carry.

In the context of this marine policy of insurance, the term "management" is similarly not limited to refer only to the person or persons physically navigating or plotting

the navigational course. The composition of the crew of the tug MISS CAROLYN might change from voyage to voyage but the tug would remain under the control of East West if its managers determined to which ports the tug goes and to which uses the tug is put. Surely the underwriters would not seriously contend that its assent is needed each time a new captain or crew member is hired by East West. A change in management occurs under this broader definition only when the managers of East West surrender control over the direction of the tug and the uses to which she is put, such as when the tug is chartered to another person or entity. In *Whiteman v. Rhode Island Insurance Company,* 78 F.Supp. 624 (E.D.La.1948) prior to the time of the actual transfer of title of the vessel, the owner agreed to allow the purchaser to use the tug for all purposes. Thus, the owner surrendered total control over the tug and for the purposes of the change in management a de facto charter had taken place. See also, *Commercial Union v. Daniels,* 343 F.Supp. 674 (S.D.Tex.1972).

With the broader definition of management in mind, it is obvious that in the instant case there was no change of management until after the tug MISS CARO-LYN docked at the Nilo Docks after anchoring the barge LOVELAND 34. Although a representative of E. & I. was on board the tug MISS CAROLYN from Panama City to Tampa and rendered navigational assistance to the crew, the tug was under the control of East West. In fact, the very sale of the tug MISS CAROLYN was conditioned on East West being able to complete its tow of the barge LOVELAND 34 which it had undertaken pursuant to contract with S. C. Loveland and this included the arrangement that the crew of East West would tow the barge LOVELAND 34 to

---

4. Because Loveland sued only the tug MISS CAROLYN and East West, its damages would, of necessity, be apportioned between those two parties in proportion to their degree of fault. That would have required MISS CAROLYN to shoulder two-thirds of the damage and East West one-third. East West, by its counterclaim sought to recover its damages for any

liability owed to Loveland. The court has found the comparative fault of East West and the State of Florida Department of Transportation to be equal. Thus, East West could recover one half of its liability from the State and each would be responsible for one-sixth of Loveland's damages.

Tampa. Only then would she be delivered to E. & I. If E. & I. had management control over the tug MISS CAROLYN, the tug would never have left New Orleans for Jacksonville but would have remained in New Orleans until the representatives from E. & I. arrived to take her to the Grand Cayman Islands pursuant to arrangements made by E. & I. Not until after the tug anchored the barge LOVELAND 34 in Tampa Bay, did the management of the tug MISS CAROLYN change. Only after the barge was anchored and the tug was delivered to the Nilo Docks did E. & I. obtain control over the tug in the sense of being able to direct where the tug would go and to what purposes she would be employed. This occurred late in the afternoon of August 18, 1973.

The more difficult question is at what point in time a change in interest or ownership in the tug MISS CAROLYN relative to when the negligent acts occurred for which the tug MISS CAROLYN is liable in rem. Although the court is involved in interpreting a marine policy of insurance within its admiralty jurisdiction, the very narrow question of when title to the tug MISS CAROLYN passed is a question of state law. Since every state of the United States, except for Louisiana has adopted the substance of the Uniform Commercial Code, absent special circumstances, title to the vessel would pass upon delivery of the vessel to the purchaser. See e. g. F.S.A. § 672.2–401(2). The Civil Code of Louisiana does not require delivery as a condition of passage of title and, in fact, specifically provides that a sale is perfect upon the execution of the Bill of Sale. See Big "A" Sand & Gravel v. Bay, Sand & Gravel, 282 So.2d 837 (La.App.1973).

Indeed Louisiana has always been a renegade among these United States. Its Supreme Court has refused to uphold the validity of the conditional sales contract while acknowledging that such contracts were recognized in all other states and by the United States Supreme Court. See Barber Asphalt Paving Co. v. St. Louis Cypress Co., 121 La. 152, 46 So. 193 (La.S.Ct.1908).

The fact of the nationwide acceptance of the Uniform Commercial Code is of no small significance to a court exercising its admiralty jurisdiction when so much of the lore of federal admiralty law stresses uniformity. Thus, although the sub-issue of passage of title is to be resolved by reference to state law, the court is still interpreting the meaning of the phrase, "change in interest," within the context of a maritime contract and pursuant to federal admiralty law.

The critical question is whether to apply the law of Louisiana or Florida. This question is answered only by determining what is the appropriate conflicts law to be applied. The nature of the issue to be resolved determines which conflicts rule governs. See Siegelman v. Cunard White Star, 221 F.2d 189 (2d 1955). Thus, in questions involving contract interpretation, admiralty conflicts law recognizes the principle of lex loci contractus; that is the law of the place where the contract is made. See Valdesa Compania Naviera v. Frota Nacional de Petroleiros, 348 F.2d 33 (3d Cir. 1965); Jansson v. Swedish American Line, 185 F.2d 212 (1st Cir. 1950).

However, the court must determine when title to the tug MISS CAROLYN passed, which is not a matter of interpreting any provision of the contract. Under the laws of Florida, the mere execution of the contract of sale would be insufficient to effect a valid transfer of title in the vessel; under the laws of the state of Louisiana the execution of the contract of sale would be sufficient to transfer title instanter. In determining a question concerning the validity and effect of a transfer of title in personalty, the universally recognized conflicts law is that of lex rei sitae or the law of the place of the situs of the personalty. See U. S. v. Guaranty Trust Co., 293 U.S. 340, 55 S.Ct. 221, 79 L.Ed. 415 (1934); Frick v. Commonwealth of Pennsylvania, 268 U.S. 473, 45 S.Ct. 603, 69 L.Ed. 1058 (1925). As stated by Mr. Justice Story in his work on Conflicts of Laws:

A nation within whose territory any personal property is actually situate has an

entire dominion over it while therein . . . .. It may regulate its transfer . . . . to the same extent that it may exert its authority over immovable property. Story, *Conflicts of Laws,* § 550, cited in *Frick v. Commonwealth of Pennsylvania,* supra, 268 U.S. at 493, 45 S.Ct. at 606, 69 L.Ed. at 1064.

There is no dispute that at the time of the execution of the contract of sale and subsequent thereto the tug MISS CAROLYN was situated in the State of Florida. She was sent into the State of Florida voluntarily by East West. Her presence within the State of Florida was far from transitory since the purchaser and current owner of the tug MISS CAROLYN E. & I. is a Florida corporation.

Prior to the time the contract of sale was executed, the tug MISS CAROLYN was actually situated in the State of Louisiana, since Louisiana was the state of enrollment, the state in which the tug was berthed when not used, the state in which its crew resided and the state of its owner's place of incorporation. Such factors have been considered in determining which states acquire the right to tax personal property such as vessels and rolling stock which move from state to state on a transitory basis in fulfilling the very purpose for which they were created. See, e. g., *City Bank Farmers Trust Co. v. Schnader,* 293 U.S. 112, 55 S.Ct. 29, 79 L.Ed. 228 (1934); *Johnson Oil Co. v. State of Oklahoma,* 290 U.S. 158, 54 S.Ct. 152, 78 L.Ed. 238 (1933); *Southern Pacific Co. v. Kentucky,* 222 U.S. 63, 32 S.Ct. 13, 56 L.Ed. 96 (1911).

█ If the transfer of title to the tug MISS CAROLYN was between two Louisiana residents and the tug remained in Louisiana when not engaged in towing, the law of another state should not govern the question of transfer of title simply because the tug was temporarily outside the state while engaged in a tow. However, in this case, the tug MISS CAROLYN was not temporarily outside the State of Louisiana. Since the tug was situated in Florida at the time the contract of sale was executed and remained in the State of Florida after the execution, it is appropriate that, in accordance with the principle of lex rei sitae, the law of the State of Florida should apply. As between the two states, Florida, the domicile of the purchaser and the state in which the tug was situated at the time of the execution of the contract, has the greater interest in having its law applied to a question concerning transfer of title. In addition, application of the law of Florida makes even greater sense since its law is the uniform law of forty-eight other states, the District of Columbia and the Virgin Islands. While it does not appear that interest analysis has been utilized in admiralty conflicts analysis, interest analysis buttresses this court's determination that the law of the state of Florida is the applicable law.

Although the parties did not stipulate that the law of Florida would apply to the transfer, it is clear that the parties intended that the title to the vessel would not pass nor would the contract of sale become final until the tug was delivered to the representative from E. & I. in Tampa. Thus, the intention of the parties conforms to the result obtained by applying Florida law.

█ Alternatively, even if the court were required to apply the law of Louisiana, the court finds that the arrangement of the parties whereby the tug MISS CAROLYN was to complete its undertaking of towing the barge to Tampa and where E. & I. was to assume no part in the tow of the barge because of its lack of collision insurance was a suspensive condition of the sale of the tug. Even under Louisiana law, there is no contract of sale without mutual assent. *Big "A" Sand & Gravel v. Bay Sand & Gravel,* supra.

Therefore since delivery of the tug is a condition precedent to the sale of the tug under the laws of the State of Florida which the court finds is the appropriate law to apply and since completion of the tow of the barge LOVELAND 34 into Tampa was a suspensive condition of the sale under the laws of Louisiana and according to the mutual intention of the parties, the court finds as a matter of law that transfer of owner-

ship of the tug MISS CAROLYN from East West to E. & I. did not occur until the afternoon of August 18, 1973 when the tug was delivered to the Nilo Docks where the crew from E. & T. was awaiting its arrival.

Since the negligent acts for which MISS CAROLYN is responsible occurred at the time she anchored the barge LOVELAND 34 in Tampa Bay, which is prior to the time that a change in management and ownership occurred, the court finds that the underwriters are liable under their policy of insurance issued on the tug MISS CAROLYN.

The court further finds that there was written assent to the change of ownership by virtue of Endorsements No. 26 and No. 27 issued on Policy No. GSD1100, which deleted the tug MISS CAROLYN from the policy of insurance effective August 25, 1973 after the collision occurred and after ownership had changed and with full knowledge of these events. The policy provision does not require that the assent be prior to the change in ownership or management.

Thus plaintiffs' policy of insurance was in full force and effect at the time of the negligent acts of the tug MISS CAROLYN and the plaintiffs are therefore liable to respond for the damages recovered against its insured, East West Towing and the tug MISS CAROLYN in Case No. FL 73–43–Civ–NCR and Case No. FL 73–61–Civ–NCR.

Amended final judgment to issue in accordance with this opinion.