660 F.2d 608
 Hilton J. PARFAIT, Plaintiff,
v.
CENTRAL TOWING, INC., Defendant-Appellee Cross-Appellant
v.
TRAVELERS INSURANCE CO., Third Party Defendant Appellant Cross-Appellee
and
American Motorists Insurance Co., Third Party
Defendant-Appellee Cross- Appellant.
 No. 81-3010
 
 Summary Calendar.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 5, 1981.
Rehearing and Rehearing En Banc Denied Feb. 17, 1982.
 Robert M. Contois, Jr., New Orleans, La., for plaintiff.
 Phelps, Dunbar, Marks, Claverie, Edward F. LeBreton, III, New Orleans, La., for Central Towing.
 Terriberry, Carroll, Yancey & Farrell, David B. Lawton, Rufus C. Harris, Jr., New Orleans, La., for American Motorists Ins. Co.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, POLITZ, and WILLIAMS, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 The push boat RAYCO 2, the central figure in this lawsuit, was constructed in 1975 by Rayco Shipbuilders and Repairers, Inc. Central Towing, Inc., a small corporation formed by Raymond Acosta, a principal of Rayco Shipbuilders, for the sole purpose of owning and operating the boat, took possession of RAYCO 2. Acosta was the sole shareholder, RAYCO 2 was the sole asset of Central Towing.
 
 
 2
 Central Towing purchased primary protection and indemnity insurance for RAYCO 2 from the Travelers Insurance Company (Travelers) through Harlan of Louisiana, Inc., an insurance agent, and obtained excess coverage from American Motorists Insurance Company through Harlan and Gulfcoast Marine, Inc., a surplus line broker.
 
 
 3
 The policies were issued on printed forms provided by the insurers. The Travelers' primary policy contained the following provision (lines 108-110):
 
 
 4
 This insurance shall be void in case the vessel named herein, or any part thereof, shall be sold, transferred or mortgaged, or if there be any change of management or charter of the vessel, or if this policy be assigned or pledged, without the previous consent in writing of this company.
 
 
 5
 (emphasis added)
 
 
 6
 RAYCO 2 operated as a tug boat pushing oil and grain barges in the Mississippi River and Gulf Intercoastal Waterway. Its three-man crew was made up of Anthony Leco, captain, plaintiff, Hilton Parfait, mate, and Elton Parfait, Hilton's son, deck hand.
 
 
 7
 In November of 1975, Johnny and Tony Callais approached Acosta with the intention of purchasing a push boat from Rayco Shipbuilders. Explaining that there would be substantial delay in getting a new boat, Acosta offered to sell them RAYCO 2. The parties began negotiations, a process which lasted for about one month. During the discussions, the Callais' accountant advised them that they could obtain a tax advantage by purchasing the corporation, Central Towing, rather than just the vessel.
 
 
 8
 Negotiations came to a fruitful conclusion. On December 11, 1975, Acosta sold all of the stock of Central Towing to the Callaises. He resigned as president and director of the corporation. An associate, Frank Deroche, resigned as secretary-treasurer and director. The new stockholders elected Johnny Callais president and Tony Callais secretary and treasurer. They assumed the responsibility of overseeing the operation of RAYCO 2 on behalf of Central Towing.
 
 
 9
 Acosta arranged for delivery of all the corporate records to the Callaises. That same day, they went to the American Bank in Houma, signed the mortgage note on the boat, and released Acosta as the principal obligor. They also went to the Coast Guard to complete the proper forms to show their status in the owning corporation.[1] On that or the following day, the Callaises went to the boat and informed the crew that they had purchased it and that the crew would thereafter take its orders from them.
 
 
 10
 Prior to the sale, Acosta, Deroche, and Preston Blanchard, Acosta's father-in-law, handled the affairs of RAYCO 2. Following the sale, those individuals had nothing further to do with either the operation or management of the vessel. The port captain duties that Blanchard previously handled were assumed by Johnny Callais, while financial and business affairs were taken over by the Callaises and their accountant.
 
 
 11
 Central Towing had previously obtained work through the services of a New Orleans broker. After the sale, the Callaises undertook personally to obtain work for the tug. They got a commitment from Gulf Rivers to move grain barges from New Orleans to Mobile, Alabama.
 
 
 12
 On December 14, 1975, just three days after the sale of stock of Central Towing, plaintiff Parfait sustained a serious personal injury on the barges in the tow of RAYCO 2 while en route to Mobile. The next day, Tony Callais called the insurance agent to report the accident. That call was the first notice to the agent that a sale had taken place.
 
 
 13
 Travelers and American Motorists denied coverage on the basis that the internal changes in Central Towing amounted to a change in management of RAYCO 2 as specifically prohibited by the policy.
 
 
 14
 Central Towing had to defend itself on a claim filed by Parfait and then prosecute the present claim for coverage against Travelers and American Motorists. It paid $9,612.35 in maintenance and wages to Parfait. Following the arrest of RAYCO 2 by Parfait, Central Towing borrowed $125,000 to finance a letter of credit in Parfait's favor in order to obtain release of the vessel. On the morning of trial, Parfait and Central Towing settled for the sum of $150,000.
 
 
 15
 Central Towing filed a cross-claim against Travelers and American Motorists, asserting that it was entitled to full indemnity for the judgment plus attorney's fees and penalties as provided by the Louisiana wrongful denial of coverage statute, La.R.S. 22:658.
 
 
 16
 Following Central Towing's settlement with Parfait, the case proceeded to trial solely on the issue of the cross-claim. The District Judge gave the jury a single interrogatory asking whether a change of management of the vessel had occurred. The jury, finding that no such change had taken place, returned a verdict in favor of Central Towing.
 
 
 17
 The Court then held a further hearing concerning Central Towing's damages and its right to recover under the Louisiana wrongful denial of coverage statute. The Court entered judgment in favor of Central Towing against Travelers in the amount of $187,173.39. Travelers and American Motorists appealed. Although sympathetic to the plight of Central Towing, whose new ownership and management would likely have been acceptable to both underwriters on application, we have no alternative but to reverse.
 
 I.
 
 18
 Counsel for both parties have overwhelmed us with citations to cases and principles of insurance law. Their efforts to address every possible question have all but obscured the one, true issue in this case: was the sale of all of Central Towing's stock to the Callaises and the immediate and complete change in directors and executive officers a "change of management" of the vessel so as to void the insurance contract?
 
 
 19
 We can accept the suggestion that we interpret an insurance policy in accordance with the understanding of the ordinary man.[2] Likewise, we construe any ambiguities which arise against the insurer, since it drafted the forms in question.[3] Try as we might, however, we can find no ambiguities.
 
 
 20
 The language of the contract is plain: a change of management of the vessel voids the contract unless Travelers has agreed in advance to the change. What does that mean? Certainly it does not mean that any change in the management of the corporation, however slight, renders the contract void. If one of the original principals had died or retired, necessitating some reshuffling of positions in Central Towing, no one could argue that those changes abrogated the insurance contract. Nor is it correct to assume that because 482,600 shares of Texaco were traded on the New York Stock Exchange on September 23, 1981,[4] the management of Texaco has changed. Such a view would indeed be "absurd". Defendant-appellee's brief at 20.
 
 
 21
 But the changes were not minor. The entire corporation, literally, changed hands. Nor is the analogy to Texaco at all helpful. As a result of the sale of stock, RAYCO 2 changed hands just as completely and just as surely as if the Callaises had purchased the vessel and left Acosta with the station wagon, Central Towing's other lone asset.
 
 
 22
 We accept the fact that the reason for structuring the transaction as a stock purchase was the potential tax advantages that would accrue to the Callaises. But accepting that decision does not exalt substance over form quite the contrary. To hold Travelers to this policy, after such a change in the operational management of RAYCO 2, would be to abuse both form and substance.
 
 
 23
 The cases cited provide useful background, but we find none that controls. In S. C. Loveland, Inc. v. East West Towing, Inc., 415 F.Supp. 596 (S.D.Fla.1976), aff'd., 608 F.2d 160 (5th Cir. 1979), East West contracted to sell the tugboat MISS CAROLYN to another company. Last minute difficulties delayed closing, so MISS CAROLYN departed on a job. At closing, the parties agreed that ownership would pass at the completion of the charter. As luck would have it, an accident took place in the interim. The Court held East West's insurers liable since no change in management had occurred. The Court furnished a helpful definition:
 
 
 24
 Management is not limited to the specific person or persons having navigational control over the vessel. In Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268 (60 S.Ct. 937, 84 L.Ed. 1197) (1940), the Supreme Court interpreted the term 'management' ... to mean the person or entity having direction and control over the purposes for which the vessel is used such as to what port she shall go and what she shall carry.
 
 
 25
 415 F.Supp. at 609 (emphasis added).
 
 
 26
 Under this definition, no one can doubt that a change in management took place. Previously, Acosta, as sole shareholder of Central Towing, had made all decisions where the boat would go, who was on the crew, what jobs to take. Following the stock sale, the Callaises made those decisions. That the new owners retained the same corporate shell, purely for tax or other purposes, does not alter the fact that indeed "direction and control" over the vessel had changed.
 
 
 27
 Lamar Towing, Inc. v. Firemen's Fund Insurance Company, 352 F.Supp. 652 (E.D.La.1972), aff'd., 471 F.2d 609 (5th Cir. 1973), involved a situation almost exactly opposite to the present one. Lamar owned a tugboat which sank off the coast of Mississippi. Another company, M&L, managed and operated the tug. Pointing out that the same individuals who owned M&L owned fifty percent of the stock in and controlled Lamar, the Court concluded that no change of management had taken place. The Court, looking as we do to the actual control of the vessel rather than the name painted on the bow or stern found that nothing had really changed since the insurer included the provision in order to avoid risks of unknown management. The court found no alteration in beneficial ownership, and thus no shifting of the risk. The individuals on whom the insurer relied were still the same, whether doing business as Lamar or M&L.
 
 
 28
 This emphasis on control provides the guide. The parties do not and cannot deny that those individuals who make the basic decisions affecting the tug's jobs, service, location, crew, maintenance, etc. have changed.[5]
 
 
 29
 Upon this disposition of the case, we need not review the other claims of error.
 
 
 30
 REVERSED AND REMANDED.
 
 
 
 [1]
 46 U.S.C. § 921 requires the listing of the shareholders of corporations which own registered vessels in order to insure that they are American citizens
 
 
 [2]
 L.S.A. C.C. Art. 1946; Jennings v. Louisiana Southern Life Insurance Company, 290 So.2d 811 (1974); Louisiana Fire Insurance Company v. Royal Indemnity Company, 38 So.2d 807 (La.App.1949); Beard v. Peoples Industrial Life Insurance Company of Louisiana, 5 So.2d 340 (La.App.1941); Appleman, Insurance Law & Practice, § 7403
 
 
 [3]
 L.S.A. C.C. Art. 1958; Carney v. American Fire and Indemnity Company, 371 So.2d 815 (La.1979); Parks v. Hall, 189 La. 849, 181 So. 191 (1938); Mayeux v. J. B. Talley Construction Company, 228 So.2d 536 (La.App.1969); Guillory v. Grain Dealers Mutual Insurance Company, 203 So.2d 762 (La.App.1967); Couch on Insurance, 2d, § 15:77; Appleman, Insurance Law & Practice, § 7401
 
 
 [4]
 The Wall Street Journal, September 24, 1981
 
 
 [5]
 Without either approval or disapproval, see, e. g., Whiteman v. Rhode Island Insurance Company, 78 F.Supp. 624 (E.D.La.1948), which supplies a vintage description of a change of management clause in an insurance contract. Whiteman contracted to sell his tugboat MAUD WILMOT. He agreed to let the purchaser have immediate use of the boat prior to closing. As inevitably happens in such cases, the tug ran aground, sustaining substantial hull damages. The insurer denied coverage because of a change of management discharging its obligation. The Court agreed
 (O)ur courts have defined the word Management, as applied to a vessel to mean the direction and the physical or manual control of such vessel. (citations omitted.)
 When, on August 5, 1947, the insured granted to (the purchaser) authority to use the tug for whatever purposes he might desire and (he) took over the complete control and direction of the tug, a change was effected in the direction and physical and manual control of the vessel so as to constitute a change in management within the meaning of the change of management clause of the policy.
 
 
 [78]
 F.Supp. at 626. If, as Whiteman holds, the exclusion operates when the vessel was on loan, it surely must apply with more force when the original beneficial owner and owner of all the stock had parted with his interest and the deal had been closed